**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

KARYN RAY,

     *Plaintiff*,

*v.*                     CASE NO. 12-cv-14433

COMMISSIONER OF        DISTRICT JUDGE GERALD E. ROSEN
SOCIAL SECURITY,       MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant.*
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at:  http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Commissioner's decision denying Plaintiff's claims for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 12.)

Plaintiff Karyn Ray was 40 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 55.) Plaintiff's employment history includes work as a housekeeper for two months, a cook for one month, a corrections officer for six years, a deli worker for one month, and a veterinary assistant for three months. (Tr. at 197.) Plaintiff filed the instant claims on March 15, 2011, alleging that she became unable to work on January 26, 2010. (Tr. at 159-65, 166-67.) The claims were denied at the initial administrative stages. (Tr. at 93, 106.) In denying Plaintiff's claims, the Commissioner considered disorders of the back, discogenic and degenerative, and affective disorders as possible bases for disability. (*Id.*) On April 3, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Patrick J. MacLean, who considered the application for benefits *de novo*. (Tr. at 20-47, 48-80.) In a decision dated June 15, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 42.) Plaintiff requested a review of this decision on July 10, 2012. (Tr. at 15-17.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on May 22, 2012, when, after review of additional exhibits[2] (Tr. at 852-69, 870-80, 881-82, 883-88,) the Appeals Council denied Plaintiff's

---

[2]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

request for review. (Tr. at 1-6.) On October 6, 2012, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B.     Standard of Review

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th

Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

4

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

## C.     Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given her RFC [residual functional capacity] and

6

considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through March 31, 2014, and that Plaintiff had not engaged in substantial gainful activity since January 26, 2010, the alleged amended onset date. (Tr. at 26.) At step two, the ALJ found that Plaintiff's tricompartmental arthritis of right knee, degenerative changes at C5-C6, degenerative changes in the lumbosacral spine, disc space collapse at L4-L5, major depressive disorder, and anxiety disorder (NOS) were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 26-27.) At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. at 40 .) The ALJ also found that as of the alleged disability onset date, Plaintiff was 38 years old, which put her in the "younger individual age 18 - 44" category. *See* 20 C.F.R. Part 404, Subpart P, App. 2. At step five, the ALJ found that Plaintiff could perform a limited range of sedentary work. (Tr. at 28-40.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 42.)

### E.    Administrative Record

### 1.    Physical Impairments

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff was treated at the Driggs Health Clinic from February 2009 through April 2010. (Tr. at 322-92.) On February 9 and 29, April 8, May 1 and 18, June 30, August 10, September 4, 14, and 30, October 16 and 26, November 9, and December 12 and 28, 2009, as well as March 3 and

30, and April 11, 2010, Plaintiff was examined for complaints of insomnia, acid reflux, abdominal pain, fatigue, malaise, headaches, depression and anxiety. (Tr. at 322-23, 326-27, 329-30, 333-34, 337-38, 343-44, 354-55, 357-60, 365-66, 371-72, 374-75, 379-80, 387-88, 390-91, 396-97, 399, 401-02.) It was noted that her physical examinations were all normal. (*Id.*) However, on June 25, 2009, Plaintiff's abdominal area and left upper extremity were reported to be tender with palpitation, but the examination was otherwise normal. (Tr. at 340-41.) On August 10, 2009, Plaintiff's lower abdomen was noted to be tender but the examination was otherwise normal. (Tr. at 354-55.) On March 3, 2010, it was noted that Plaintiff had normal range of motion and strength in all extremities. (Tr. at 396.) On April 11, 2010, the provider at the Driggs Health Clinic "explained to her" that they would "not refill benzos or pain meds early regardless of circumstance." (Tr. at 402.)

On June 9, 2010, an MRI of Plaintiff's cervical spine showed "[o]verall congenitally small central canal and old posttraumatic degenerative changes at the C5-6 level" with "associated severe central canal stenosis," but "[n]o acute or destructive process noted." (Tr. at 808-09.) An MRI of the lumbar spine also taken on June 9, 2010, showed "[f]ocal moderately significant degenerative changes at the L4-5 level[,]" "degenerative changes above and below this level mild in comparison," and "[n]o evidence of fracture or other significant abnormality." (Tr. at 810.)

On June 15, 2010, Plaintiff was treated a the Eastern Idaho Spine Center where it was noted that her gait was "normal, nonantalgic" and that she "walks on toes and heels without difficulty." (Tr. at 801-02.) Plaintiff's spine was "unremarkable" and the only notation regarding range of motion was "some pain w/ forward flexion." (Tr. at 802.)

X-rays of Plaintiff's left wrist, chest and abdomen taken on June 26, 2009, were "[n]egative" and "normal." (Tr. at 290-91.)

On July 9, 2009, Plaintiff was examined by Phillip George Poole, M.D., of the Driggs Health Clinic, for epigastric pain; Dr. Poole found "some epigastric tenderness and left upper quadrant tenderness." (Tr. at 346.) Dr. Poole noted that Plaintiff had been "seen in the emergency room two nights ago and she was given Valium" and "does feel somewhat better on this regimen." (*Id.*) Dr. Poole "discussed the risks of Valium use for more than just a short time and strongly advised her against this." (*Id.*)

On August 3, 2009, x-rays of Plaintiff's right tibia and fibula were "[n]egative." (Tr. at 296.)

On November 28, 2009, Plaintiff sought treatment in the emergency room for abdominal pain. (Tr. at 300.) It was noted that Plaintiff "appears to be in mild to moderate distress, more histrionic than anything, I believe." (*Id.*) After an examination revealed nothing abnormal, she was given pain medication and sent home. (Tr. at 301, 305.)

An ultrasound of Plaintiff's abdomen taken on November 30, 2009, was "normal." (Tr. at 308.) On December 14, 2009, Sandra Lotstein, D.O., noted that Plaintiff's abdominal pain was still of "unknown etiology." (Tr. at 311.)

On January 26, 2010, the alleged onset date, Plaintiff was treated after a slip and fall at work during which she twisted her knee. (Tr. 312.) Plaintiff was discharged with instructions to ice and elevate her knee and use the brace that she already owned. (Tr. at 314.)

On January 27, 2010, Plaintiff was treated for "right knee injury and thought to have a potential internal derangement, pending evaluation by Dr. Brown." (Tr. at 392, 635.) Plaintiff was given a knee immobilizer brace and prescription pain medication and was sent home with a "work release until she sees Dr. Brown . . . ." (*Id.*)

On January 30, 2010, Maurice D. Brown, M.D., examined x-rays of Plaintiff's right knee and found "mild breaking of the tibial eminence, mild interconylar notch stenosis, and a small periarticular osteophyte (femoral condyle). I do not appreciate evidence of acute osseous injury." (Tr. at 394.) Dr. Brown therefore diagnosed "[m]ild degenerative changes, right knee." (*Id.*) Dr. Brown indicated that Plaintiff could return to work with the following limitations: no squatting, climbing, running or jumping. (Tr. at 636.) Two days later, on February 1, 2010, Dr. Brown indicated that Plaintiff could "return to work immediately with NO limitations." (Tr. at 637.)

On February 14, 2010, Dr. Brown stated that Plaintiff could return to work with the following limitations: no climbing more than 30 stairs, no lifting more than 40 pounds, and carry up to 10 pounds only. (Tr. at 638.) On February 24, 2010, Dr. Brown's office, through his nurse, indicated that "due to severe knee pain and swelling, Karen is to avoid walking and standing, though she may do light duty that does not involve walking or standing until she has been cleared to resume normal activity by Dr. Brown." (Tr. at 639.) Also on February 24, 2010, Dr. Brown indicated that "[i]t is reasonable that she takes a period of time off work to focus on regaining range of motion and improving pain control. I plan to see her in one week and we will make treatment choices based on her progress at that time." (Tr. at 657.)

On March 22, 2010, Plaintiff was involved in a motor vehicle accident which caused "contusions, and sprains/strains of the c-spine, thoracic spine and lumbar spine." (Tr. at 318.) Plaintiff was discharged with advice to rest and use ice and heat, and "use Tylenol or Ibuprofen." (*Id.*) A CT scan of Plaintiff's cervical spine taken on March 22, 2010, revealed "[d]iffuse mild degenerative changes thoracic spine, no acute process." (Tr. at 320.) The degenerative changes were noted to be "consistent with patient's large body habitus." (*Id.*) X-rays of Plaintiff's lumbar spine taken on March 23, 2010, showed "[d]egenerative changes, no acute process." (Tr. at 319.)

The degenerative changes noted were "[m]ild to moderate disk space narrowing and minimal arthritic facet and spurring present consistent with degenerative changes L3 through S1." (*Id.*)

On March 28, 2010, Plaintiff was seen by Dr. Brown, who noted that Plaintiff was "involved in a motor vehicle accident in which she was the restrained driver." (Tr. at 397.) Dr. Brown assessed a "[c]ontusion, anterior knee." (*Id.*) It was also noted that Plaintiff was "awaiting a third-opinion evaluation through her Workers' Comp provider." (*Id.*)

On July 28, 2010, Plaintiff was given an epidural injection under fluoroguide. (Tr. at 805.)

On October 27, 2010, Plaintiff was examined by Todd Murphy, M.D., who diagnosed "[p]ain, patellofemoral joint, right" and recommended "conservative comprehensive patelloformal program" and "shoe wear modification[.]" (Tr. at 682.)

On January 17, 2011, Plaintiff was treated for low back pain at Scheurer Hospital in Pigeon, Michigan. (Tr. at 475.) It was noted that "[s]traight leg raise produces pain but not radicular symptoms." (*Id.*) Plaintiff was given prescription pain medication and sent home.

On March 13, 2011, a sacrococcygcal MRI showed "[c]hanges of degenerative disk and facet disease in lower lumbar spine" but was "[o]therwise normal MR examination of the sacrum and coccyx." (Tr. at 477, 541.) On the same date, an MRI of the lumbar spine showed "[d]egenerative disk disease and mild facet arthropathy in the lower lumbar spine without spinal stenosis" and "[r]ight foraminal/extraforaminal nuclear protrusion/herniation at L4-5, causing mild displacement  of the L4 nerve root" and "[s]mall central nuclear protrusion/herniation at L5-S1 without displacement of nerve roots." (Tr. at 480, 540.)

On April 19, 2011, Plaintiff sought treatment at Thumb Physical Medicine & Rehab, P.L.L.C. (Tr. at 481.) Joel Guzman, M.D., noted that Plaintiff had an antalgic gait and a "[l]imited range of motion for flexion-extension and lateral rotation, spasm noted in bilateral lumbar

paraspinal muscles, tenderness appreciated more in bilateral SI joint on deep palpation, SLR equivocal." (Tr. at 482, 579.) Dr. Guzman diagnosed "[l]ow back pain secondary to L4-5 disc bulge[,]" "[l]umbar myositis[,]" "[b]ilateral sacro-ilitis[,]" and "[g]ait dysfunction antalgic gait." (*Id.*) Dr. Guzman recommended trigger point injection therapy, prescription medication, and physical therapy for Plaintiff's lower back. (*Id.*)  On April 27, 2011, it was noted that Plaintiff had "started taking the Vicodin 5/500 from once to twice a day and [S]oma from once a day to twice a day[.]" (Tr. at 483.) On that same day, Plaintiff's muscle strength tested at 5/5 in all four extremities but her limited range of motion in her back persisted. (Tr. at 483-84, 580-81.) Dr. Guzman doubled her dosage of Vicodin and Soma to match Plaintiff's admitted increase and "post date[d]" her prescription. (Tr. at 484.)

On June 23, 2011, Dr. Guzman examined Plaintiff and found her to be "intact" neurologically, her sensory abilities were 100%, and her muscle strength was 5/5 on all four extremities. (Tr. at 584.)

On August 10, 2011, Plaintiff underwent a neurological consultation with Gerald R. Schell, M.D. (Tr. at 537-38.) Dr. Schell concluded that Plaintiff "has incapacitating pain with severe disc space collapse and changes of foraminal stenosis with intractable radiculopathy. I think that she would benefit from surgical intervention, however, she needs to stop smoking before that can be considered. . . ." (Tr. at 537.)

On August 24, 2011, Dr. Guzman noted that he spoke  at length to the patient "in regards to the risk of using a stronger narcotic pain medication specially [sic] if she already considered surgery in the next 2 months. I reminded her that the more that she use[s] a narcotic pain medication, the more that she will be dependent on it. Patient is aware of this and still wanted to

change her medication. Thus, I will discontinue Vicodin 5/500 and start her on Vicodin ES on tab p.o.q. 8." (Tr. at 589.)

On September 22, 2011, Dr. Guzman noted that "[p]atient's story is very inconsistent in regards to her having surgery or not." (Tr. at 591.)

On October 11, 2011, Plaintiff was treated by Douglas Pankratz, M.D. It was noted in Plaintiff's records that Plaintiff called the office back after the doctor had left and "stated that she had called her attorney and that he said 'Dr. Pankratz should be able to back date her disability to May 2011 by reviewing her medical records she provided.'" (Tr. at 615.) Plaintiff was told that Dr. Pankratz "will not[,] as he told her in the office." (*Id.*) X-rays of Plaintiff's right knee taken that same day were "[n]egative." (Tr. at 616.)

On October 20, 2011, Dr. Guzman indicated that "[t]his patient is showing a drug seeking behavior. We have confirmed from Dr. Schell's office that he never got a call from this patient for an appointment. And again, she mentioned the same story." (Tr. at 593.) Dr. Guzman nonetheless renewed her Vicodin prescription. (*Id.*) On November 16, 2011, Dr. Guzman again noted that "[t]his patient is showing drug seeking behavior" and renewed her Vicodin prescription. (Tr. at 594.)

On October 22, 2011, an MRI of Plaintiff's right knee showed "scarring/postsurgical change" that was "stable" and "focal thickening of the proximal lateral patellar tendon in keeping with prior surgery,]" "[t]ricompartmental osteoarthritis, slightly progressed" and "mild to moderate joint effusion." (Tr. at 618.)

On November 1, 2011, Dr. Pankratz noted that, as to Plaintiff's knee pain, "she is not a candidate for joint replacement at this point. I do not think further arthroscopy would be beneficial

at this juncture. There is really no identifiable treatment pathology that is going to be addressed by this." (Tr. at 619.)

On November 29, 2011, Plaintiff was assessed by Dr. Pankratz for a functional capacity evaluation ("FCE"). (Tr. at 598-611.) Dr. Pankratz noted that Plaintiff was "unable to complete many of the required lifts due to complaints of pain," so the tests were stopped and the FCE was deemed "[i]nvalid" and "unreliable indicators of her true work ability." (Tr. at 598.)

On December 19, 2011, Dr. Schell gave Plaintiff a "[l]umbar epidural injection" that Plaintiff tolerated well. (Tr. at 696.) On January 11, 2012, Dr. Schell stated that Plaintiff "does not have major neurologic deficit" and that although Plaintiff "had a pain contract with Dr. Guzman," she "does not want to continue with him." (Tr. at 820.) Dr. Schell explained that he "certainly would not be able to write any narcotics" while she had a contract with Dr. Guzman. (*Id*.) Dr. Schell also noted that Plaintiff's condition was "stable." (*Id.*)

On January 26, 2012, Richard Moyer, D.O., examined Plaintiff and diagnosed "patellofemoral chondromalacia of the right knee" and recommended "an arthroscopy[.]" (Tr. at 825.) On February 14, 2012, Plaintiff underwent an arthroscopy of her right knee. (Tr. at 825-26.) On March 9, 2012, at Plaintiff's follow-up appointment, Plaintiff's knee showed "no effusion[,]" her "range of motion [was] 0-110" degrees and her knee was well healed. (Tr. at 827.)

On March 23, 2012, Plaintiff was examined by Mark Adams, M.D., who diagnosed "[l]umbar disk herniation" and recommended continued pain management with Dr. Guzman. (Tr. at 829-30.) Dr. Adams noted that Plaintiff's "strength is relatively preserved" and that her "[c]ranial nerves 2 through 12 appear intact." (Tr. at 830.)

## 2. Mental Impairments

14

Plaintiff has been treated for depression since 2005. (Tr. at 758-98.) Plaintiff was treated at the Driggs Health Clinic from February 2009 through April 2010. (Tr. at 322-92.)  On February 9 and 29, April 8, May 1 and 18, June 30, August 10, September 4, 14, and 30, October 16 and 26, November 9, and December 12 and 28, 2009, as well as March 3 and 30, and April 11, 2010, Plaintiff was examined for complaints of insomnia, acid reflux, abdominal pain, fatigue, malaise, headaches, depression and anxiety. (Tr. at 322-23, 326-27, 329-30, 333-34, 337-38, 343-44, 354-55, 357-60, 365-66, 371-72, 374-75, 379-80, 387-88, 390-91, 396-97, 399-90, 401-02.) It was consistently noted that Plaintiff was oriented to time, place, and manner, that her memory was intact for recent and remote events, and that there was "no depression, anxiety, or agitation." (*Id.*) However, on May 1, 2009, "depressed mood" was noted and on March 3 and 30, 2010, Plaintiff was "tearful during interview." (Tr. at 333, 396, 399.) On April 11, 2010, the provider at the Driggs Health Clinic "explained to her" that they would "not refill benzos or pain meds early regardless of circumstance." (Tr. at 402.)

At the request of Disability Determination Services ("DDS"), Plaintiff was examined on June 22, 2009, by Kenneth P. Lindsey, Ph.D. (Tr. at 275-83.) Dr. Lindsey summarized:

> Ms. Ray reports a history of bipolar symptomatology, depression, and panic with agoraphobia. She reports problems with attention/concentration and memory functions. However, there is strong indication of exaggeration of her neurocognitive complaints, as indicated by an invalid WMS-IV that is not consistent with her history of having obtained a GED, having worked as a correctional officer for 5 years, and with her ability to report her history in a detailed and organized fashion. This raises concern that she has exaggerated her mental health difficulties as well. There is the possibility of malingering although I am not able to make that diagnosis firmly at this point in the absence of a malingering assessment. I note that Ms. Ray reports a history of alcohol and prescription drug use, but denies those problems now. Prognosis is indeterminant in light of the foregoing.
>
> I am likewise not able to make any firm conclusions as to Ms. Ray's work-related functional abilities. She would appear, based on her reports of her recent work history, to show moderate limitations in her abilities to understand, remember and carry out detailed instructions, sustain her attention, and persist with tasks – due to

her mood instability, depression, and anxiety. Again, based on her self-report, she appears to show moderate limitations in her abilities to respond appropriately to supervision, deal with coworkers, and cope with work pressures – due to the mental health symptomatology. Overall, Ms. Ray thus appears to show moderate limitations in her abilities to reason and to make personal, social and occupational adjustments.

(Tr. at 282-83.)

On June 9, 2010, an MRI of Plaintiff's brain was "[n]ormal." (Tr. at 807.) Plaintiff sought treatment at the Mental Wellness Center and was assessed on June 17, 2010. (Tr. at 491-505.)

Plaintiff then moved to Michigan and sought treatment at Huron Behavioral Health, where she was initially assessed by Tracey Dore, CAAC, LMSW, MSW, on October 7, 2010. (Tr. at 407-14.) Plaintiff reported that she had been addicted to Xanax three years ago, but had no current substance abuse issues. (Tr. at 409.) Plaintiff also indicated that she would be "attending school for nursing starting in January." (Tr. at 410.) Ms. Dore concluded that "[a]fter assessing the consumer's skills, it was determined that the consumer is functionally independent in all areas of daily living, self-care, socialization, and communication." (Tr. at 411.) Plaintiff's mental status exam showed Plaintiff to be normal, appropriate, educated, intelligent, logical, coherent, good, and accurate, in all areas. (Tr. at 411-12.) It was noted that Plaintiff cried at times throughout the exam. (Tr. at 411.) Plaintiff was diagnosed with Major Depressive Disorder, recurrent, moderate, and was assessed a GAF score of 50. (Tr. at 412-13.) It was noted that Plaintiff "would like to see the psychiatrist to keep her on her medications as she is very scared about not having them and going into a deep depression. (Tr. at 413.)

On October 28, 2010, it was noted that Plaintiff was "stressed by the thought of the workman's comp stopping and that will leave her with little money [but that s]he is still planning the wedding on the 22 to her fiancé who is in prison. She is optimistic." (Tr. at 423.) As of November 19, 2010, it was still Plaintiff's primary goal to attend nursing school and "get a career

back." (Tr. at 439.) On December 3, 2010, it was noted that Plaintiff "decided not to marry the man in prison" but that she had "gotten engaged to another man since then." (Tr. at 442.) It was also noted that Plaintiff was "trying to get into school for January with a Pell grant so that she can start nursing school." (*Id.*) Plaintiff cancelled appointments on December 22, 2010, January 5, February 9, and February 16, 2011. (Tr. at 443-44, 447, 449.)

On February 24, 2011, Plaintiff was examined by Gregory Allen, M.D., who noted that Plaintiff was

> [o]ptimistic about current therapist and intends to follow through with regular appointments. She shows dysphoric mood and some psychomotor agitation and elevated anxiety. Expresses uncertainty about timing of actual divorce completion. She shows full affect. No thought blocking or flat affect. . . . Her sensorium is clear and alert. Her gait is steady as she enters and exits interview . . . . Concentration good. Memory and immediate recall is good as well as long term memory. Judgment and insight is excellent. Reality testing intact.

(Tr. at 451.) Plaintiff was again diagnosed with depressive disorder and was assessed a GAF score of 55. (*Id.*)

On March 14, 2011, Plaintiff called and cancelled her counseling appointment. (Tr. at 456.) On March 23, 2011, it was noted by Dr. Javed Haque at Huron Behavioral Health that Plaintiff "thanked me for restarting the Valium because it helps with her anxiety the best. I psycho educated the patient on Valium and its habit forming potential." (Tr. at 457.)

On April 4, 2011, Dr. Allen noted that Plaintiff's "[m]emory although good and concentration is fair to good, she reports it has decreased and she is less than successful in her college coursework. Insight and judgment is good to very good. Reality testing is intact. She shows no manic mood trends. . . [and is] oriented in all three spheres." (Tr. at 448.) On April 19 and 28, 2011, it was noted that Plaintiff's mental status exam was normal other than her mood was "anxious." (Tr. at 460, 462.)

In 2012, Plaintiff again sought treatment with Huron Behavioral Health for assistance in dealing with her defiant teenaged son. (Tr. at 833-51.)

### 3.    Plaintiff's Daily Activity Report

Plaintiff indicated in her Daily Activity Report that she takes care of her 13 year-old son, drives to the store, and cooks and does laundry for him, but that he helps carry the grocery bags and the laundry. (Tr. at 205.) Plaintiff also indicated that she has two dogs and her son has one dog that they care for. (*Id.*) Plaintiff is able to care for her own personal needs, prepares food on a daily basis, dusts, goes outside once a day, drives, shops for food and her son's school supplies twice a month, and enjoys reading and watching television, although she indicates that it is difficult to concentrate and remember what she has read. (Tr. at 206-08.)

### 4.    Administrative Hearing

At the administrative hearing, the ALJ asked the Vocational Expert ("VE") to consider an individual with Plaintiff's background who

> [could be] lifting 20 pounds occasionally, lifting up to 10 pounds frequently, and light work as defined by regulations, who should never climb ladders, ropes or scaffolds; occasionally climb ramps or stairs, balance, stoop, crouch, kneel and crawl; avoid use of heavy machinery, avoid all exposure to unprotected heights whose work should be limited to simple, routine, repetitive tasks, specifically one or two steps tasks.
>
> Employed in a low stress jobs [sic] defined as having only occasional changes in the work setting; only occasional interaction with the public.

(Tr. at 76.) The VE responded that such a person could perform Plaintiff's past relevant work as an assembler. (*Id.*) The ALJ then asked the VE to assume the above but to change the hypothetical such that the person "is able to lift up to 10 pounds occasionally; standing or walking for approximately two hours per eight hour work day, sitting for approximately six hours in an eight hour workday with normal breaks that's incorporated to less than the limitations from hypothetical

one . . . ." (*Id.*) The VE responded that such a person could not perform any past relevant work because the hypothetical described a sedentary work level. (Tr. at 77.) The VE also testified that such a person could perform the 2,000 surveillance system monitor jobs, the 8,000 assembler jobs, and the 500 inspector jobs at the sedentary, unskilled level available in Southeastern Michigan. (Tr. at 77.) The ALJ clarified that if a person were "off task more that 20 percent of an eight hour day," such a person would not be able to perform any jobs. (Tr. at 78.) In response to the ALJ's question, the VE confirmed that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (*Id.*)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to perform a limited range of sedentary work. (Tr. at 15-18.) Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a)(1991). Social Security Ruling 83-10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

S.S.R. 83-10.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.   Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 9.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ "erred as a matter of law in assessing Karyn Ray's credibility and by failing to properly evaluate the medical records of evidence and, thereby, forming an inaccurate hypothetical that did not accurately portray Karyn Ray's impairments." (Doc. 9 at 6-17.) Plaintiff contends that, "despite what the ALJ indicates, [Plaintiff's] statements in regards to the extent and severity of her impairments was [sic] not an exaggeration." (*Id*. at 11.) Although Plaintiff contends that the "great weight of the evidence does support Karyn Ray's testimony" (Doc. 9 at 17), I note that the substantial evidence test does not require such weighing and instead only asks whether substantial evidence supports the ALJ's conclusions, regardless of whether substantial evidence could also support the opposite conclusion. *McClanahan, supra.*

### a.   Credibility Analysis

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the

relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility"); *Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999 WL 98645 at *3 (6th Cir. Feb. 11, 1999) (unpublished). However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p. In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then

determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *Id.* Although a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," C.F.R. §§ 404.1528(a), 416.929(a), "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded *solely* because they are not substantiated by objective medical evidence." SSR 96-7p, at *1 (emphasis added). Instead, the ALJ must consider the following factors:

> (i)    [D]aily activities;
>
> (ii)   The location, duration, frequency, and intensity of . . . pain;
>
> (iii)  Precipitating and aggravating factors;
>
> (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v)    Treatment, other than medication, . . . received for relief of . . . pain;
>
> (vi)   Any measures . . . used to relieve . . . pain.

*Felisky*, 35 F.3d at 1039-40; SSR 96-7p, at *3. Furthermore, the consistency of the evidence, including a claimant's subjective statements, is relevant in determining a claimant's credibility. 20 C.F.R. § 404.1527(c); SSR 96-7p, at *5.

In the instant case, the ALJ thoroughly considered each of the above factors. (Tr. at 26-40.) I suggest that the ALJ's finding – that the impairments do not cause the degree of limitations alleged by the claimant – is supported by substantial evidence. (Tr. at 40.) Although there is a cited history of right knee pain, degenerative changes of the cervical spine, degenerative changes in the lumbosacral spine, and depression, there is no medical evidence which could reasonably be expected to produce disabling symptoms.

22

As to physical impairments, although Plaintiff complained of insomnia, acid reflux, abdominal pain, fatigue and headaches from February 2009 through April 2010, physical examinations were all normal except for some occasional reported tenderness upon palpitation. (Tr. at 322-23, 326-27, 329-30, 333-34, 337-38, 343-44, 354-55, 357-60, 365-66, 371-72, 374-75, 379-80, 387-88, 390-91, 396-97, 399-90, 401-02.) Plaintiff also consistently had good range of motion and strength in all extremities. (Tr. at 396, 584, 830.) As of June 15, 2010, Plaintiff's gait was "normal, nonantalgic" and she could "walk[] on toes and heels without difficulty." (Tr. at 801-02.)

X-rays of Plaintiff's left wrist, chest and abdomen, right tibia, and fibula were either "[n]egative" or "normal." (Tr. at 290-91, 296.) An ultrasound of Plaintiff's abdomen taken on November 30, 2009, was also "normal." (Tr. at 308.) On December 14, 2009, Sandra Lotstein, D.O., noted that Plaintiff's abdominal pain was still of "unknown etiology." (Tr. at 311.)

Although degenerative changes were noted in Plaintiff's right knee, on January 30, 2010, Dr. Brown noted that the changes were "mild" and that there was "no evidence of acute osseous injury." (Tr. at 394.) On February 1, 2010, Dr. Brown indicated that Plaintiff could "return to work immediately with NO limitations." (Tr. at 637.) However, Dr. Brown later added limitations and on February 24, 2010, indicated that it was "reasonable" for Plaintiff to take time off work to focus on regaining range of motion and improving pain control. (Tr. at 657.)

X-rays of Plaintiff's right knee taken on October 11, 2011, were "[n]egative," (Tr. at 616) and an MRI taken eleven days later showed "scarring/postsurgical change" that was "stable" and "mild to moderate joint effusion." (Tr. at 618.) Dr. Pankratz therefore concluded that Plaintiff was not a candidate for arthroscopy or joint replacement and noted that "[t]here is really no identifiable treatment pathology that is going to be addressed by this." (Tr. at 619.) Dr. Moyer agreed to

23

perform an arthroscopy in February 2012, after which the knee showed "no effusion[,]" the "range of motion [was] 0-110" degrees, and her knee was well healed. (Tr. at 825-27.)

Similarly, although x-rays taken on March 23, 2010, of Plaintiff's lumbar spine showed degenerative changes, they were "mild to moderate" and showed "no acute process." (Tr. at 319.) On January 11, 2012, Dr. Schell stated that Plaintiff "does not have major neurologic deficit" and also noted that Plaintiff's condition was "stable." (Tr. at 820.) Dr. Adams also found that Plaintiff's "[c]ranial nerves 2 through 12 appear intact." (Tr. at 830.)

In October 2010, Plaintiff also indicated that she would be "attending school for nursing starting in January." (Tr. at 410.) As of November 19, 2010, it was still Plaintiff's primary goal to attend nursing school and "get a career back." (Tr. at 439.)

As to mental impairments, although Plaintiff reported depression and anxiety from February 2009 through April 2010, it was consistently noted that Plaintiff was oriented to time, place, and manner, her memory was intact for recent and remote events, and there was "no depression, anxiety, or agitation," except for one notation of "depressed mood" and one occasion where Plaintiff was tearful. (Tr. at 322-402.) Ms. Dore likewise concluded that Plaintiff was "functionally independent in all areas of daily living, self-care, socialization, and communication." (Tr. at 411.) Plaintiff's mental status exam showed Plaintiff to be normal, appropriate, educated, intelligent, logical, coherent, good, and accurate, in all areas. (Tr. at 411-12.)

Dr. Allen found that Plaintiff has "[n]o thought blocking or flat affect," that her "sensorium is clear and alert," her "gait is steady as she enters and exits," her "[c]oncentration good," her "[m]emory and immediate recall is good as well as long term memory," her "[j]udgment and insight is excellent," and her "[r]eality testing intact." (Tr. at 451.) On April 4, 2011, Dr. Allen noted that Plaintiff's "[i]nsight and judgment is good to very good," "[s]he shows no manic mood

trends," and is "oriented in all three spheres." (Tr. at 448.) On April 19 and 28, 2011, it was noted that Plaintiff's mental status exam was normal other than that her mood was "anxious." (Tr. at 460, 462.)

Furthermore, Plaintiff's credibility was questioned by her treating and examining physicians. An emergency room notation concluded that Plaintiff "appears to be in mild to moderate distress, more histrionic than anything, I believe." (Tr. at 300.) Plaintiff contends that, "despite what the ALJ indicates, [Plaintiff's] statements in regards to the extent and severity of her impairments was [sic] not an exaggeration." (Doc. 9 at 11.) However, Dr. Lindsey concluded Plaintiff was exaggerating her symptoms. Dr. Lindsey stated that Plaintiff "reports problems with attention/concentration and memory functions. However, there is strong indication of exaggeration of her neurocognitive complaints . . . [and] [t]here is the possibility of malingering although I am not able to make that diagnosis firmly at this point in the absence of a malingering assessment." (Tr. at 282-83.)

I therefore suggest that the ALJ's statement regarding exaggeration is supported by substantial evidence and that such evidence properly supports the ALJ's credibility findings.

Plaintiff's physicians also noted concern over Plaintiff's desire for narcotic pain medication which also undercuts Plaintiff's credibility. (Tr. at 346, 402, 589, 820.) On October 20, 2011, Dr. Guzman expressly stated twice that Plaintiff was "showing a drug seeking behavior" and that she had not been truthful in reporting whether she had actually called Dr. Schell's office. (Tr. at 593-94.) Dr. Pankratz also shed some light on Plaintiff's veracity when he refused to "back date her disability." (Tr. at 615.) In addition, the modest treatment recommended and received for Plaintiff's physical and mental impairments is inconsistent with a finding of disabling symptoms. *See Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007).

I therefore suggest that the ALJ's finding that Plaintiff was not fully credible is supported by substantial evidence and should not be disturbed.

### b.     Past Relevant Work and RFC Analysis

I suggest that the ALJ's RFC analysis is also supported by substantial evidence for the same reasons as listed under the credibility analysis. In addition, I note that the ALJ incorporated the only opinion evidence as to residual functional capacity which was provided by Dr. Lindsey (Tr. at 282-83) when he limited the hypothetical to simple, routine, repetitive tasks, specifically, to one- or two-step tasks in low stress work settings and only occasional contact with the public. (Tr. at 76.) None of Plaintiff's examining or treating physicians opined that Plaintiff lacks the functional capacity to work. Even Dr. Brown's statement that it was "reasonable" for Plaintiff to take time off work to focus on regaining range of motion and improving pain control did not express or imply that Plaintiff would be permanently unable to work. (Tr. at 657.)

Finally, I suggest that the hypothetical posed to the VE properly incorporated the limitations found in the RFC assessment and was in harmony with the objective record medical evidence and Plaintiff's own statements that she takes care of her 13 year-old son, drives to the store, cooks and does laundry for him with some help carrying the grocery bags and the laundry, cares for three dogs, cares for her own personal needs, prepares food on a daily basis, dusts, goes outside once a day, drives, shops for food and her son's school supplies twice a month, and enjoys reading and watching television. (Tr. at 205-08.) *See Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

### 3.     Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice

26

within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   <u>REVIEW</u>

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ 𝕮𝖍𝖆𝖗𝖑𝖊𝖘 𝕰 𝕭𝖎𝖓𝖉𝖊𝖗

CHARLES E. BINDER

Dated: July 3, 2013                    United States Magistrate Judge

### <u>CERTIFICATION</u>

I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on Richard Doud, Ameenah Lewis, Jessie Wang-Grimm and William Woodard; and served on District Judge Rosen in the traditional manner.

Date:  July 3, 2013                    By   s/*Jean L. Broucek*
                                       Case Manager to Magistrate Judge Binder